UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **DENA BELCHER,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:10-cv-3475** |
| | § | |
| | § | |
| **FLUOR ENTERPRISES, INC.,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

MEMORANDUM AND ORDER

Before the Court is Defendant Fluor Enterprises, Inc. ("FEI's") Motion for

Summary Judgment (Doc. No. 40). After considering the Motion, all responses and

replies, and the applicable law, the Court concludes that Defendant's Motion should be

**GRANTED**.[1]

**I. BACKGROUND**

FEI hired Dena Belcher on March 10, 2008 to work as a Utility Worker on the

construction of the Oak Grove Power Plant (the "Oak Grove Project") at the entry wage

of $16.00 per hour. (Dena Belcher Dep. 23:17-24:17, June 6, 2011.) The laborers on the

Utility crew were generally non-skilled personnel. (Doc. No. 45-2, ¶ 4 [Belcher Decl.];

Belcher Dep. 218:22-25.) Utility workers were generally responsible for sweeping,

---

[1] Defendant's objections to Plaintiff's summary judgment evidence are sustained. However, even if the objections were overruled, summary judgment for the Defendant would be appropriate. Plaintiff's request to file a surreply (Doc. No. 48) is denied.

picking up trash, and keeping the construction area clean of debris. (Belcher Dep. 165:18-166:2).

When Belcher was hired she received a copy of FEI's Craft Employee Handbook, which outlined the procedures by which employees could report problems, suggestions or complaints by using the Open Door Policy or calling FEI's Compliance Hotline. (Belcher Dep. 166:19-24, 168:10-19, 170:9-18, 171:8-21.) Belcher understood she could raise concerns with a supervisor, the Safety Department, or Human Resources ("HR"), and could contact someone higher up if she was dissatisfied with the result. (*Id.* 303:12-24, 314:4-315:1.) She also understood that she could bypass local management altogether and call the Compliance Hotline. (*Id.* 170:9-18, 314:22-315:1.)

Belcher also learned during orientation that FEI offered classes for employees to learn craft jobs on a first-come, first-served basis. (*Id.* 220:2-221:9, 293:17-294:15.) While at FEI, Belcher attended courses on subjects like project manager and safety, "fire watch" certification, and "confined space" training. (*Id.* 242:2-243:6, 292:11-293:16.) In October 2008, all the employees at the Oak Grove Project were required to attend a training session titled "Maintaining a Respect-Based Workplace," in which issues such as harassment and discrimination were discussed. (*Id.* 291:8-24)

Following her satisfactory three month evaluation, on June 5, 2008, Belcher received a pay raise to $16.60 per hour. (*Id.* 296:18-297:8) Approximately two weeks later, Michael Cheatham, the Utility Superintendent, promoted Belcher to Utility Foreman, with a wage increase to $26.35 per hour. (*Id.* 296:21-298:17; Doc. No. 40-2, ¶ 4 [Carmichael Decl.]) As a supervisor, Belcher could opt out of performing the tasks

assigned to her cleaning crew. (Belcher Dep. 270:24-272:8) Both women and men were assigned to Belcher's Utility crew. (Doc. No. 40-2, ¶ 5 [Carmichael Decl.])

Upon her promotion, Belcher initially reported to Dedrick Richardson, a Utility General Foreman. (96:11-17; Doc. No. 40-2, ¶ 6 [Carmichael Decl.]) On or around September 1, 2008, Belcher began reporting to Martin Solis, another Utility General Foreman. (Belcher Dep. 98:5-9; Doc. No. 40-2, ¶ 6 [Carmichael Decl.]) During Belcher's time at FEI, she received two reprimands, a verbal one for arguing with another female employee, and a written reprimand for excessive absenteeism.

When she was hired, Belcher was informed that her employment with FEI would be temporary and that she would be laid off when the Oak Grove Project neared completion (*Id.* 236:7-13.) FEI began a series of layoffs at the beginning of 2009. (Doc. No. 40-2, ¶ 12 [Carmichael Decl.]) Belcher was the first Utility Foreman to be laid off. *Id.* Belcher's disciplinary history, her construction industry experience, and her supervisory experience were evaluated by Schmidt, the Utility Superintendent, and Carmichael, the Senior Human Resources Manager. *Id.* Belcher completed an exit interview form when she left the company. (Belcher Dep. 171:24-172:17, Doc. No. 40-10 [Exit Interview Form]) Belcher did not raise concerns of harassment at this time. (Belcher Dep. 176:25-177:17.) She rated all aspects of her job and working environment positively. (*Id.* 176:10-24; Doc. No. 40-10 [Exit Interview Form]))

Belcher brings three claims against FEI: sex discrimination, hostile environment, and retaliation. Belcher bases her claims on the alleged assignment of demeaning job duties, the denial of training and promotional opportunities, the selective enforcement of disciplinary rules, inappropriate comments made to her by other workers, uncomfortable

work conditions, and offensive graffiti on the walls. Belcher alleges that, although she was promoted to a position of authority, she was constantly undermined. (Belcher Dep. 98:1-100:21.) Belcher also recounted a number of specific incidents in her deposition to support her discrimination claims.

## 1. Rouse's Inappropriate Behavior

On October 22, 2008, Belcher received a complaint from one of her utility workers, Mandy Wandrick, that Robert "Doc" Rouse, a Senior Occupational Nurse who treated minor medical conditions at the Oak Grove Project, had touched Wandrick in an inappropriate way. (Belcher Dep. 203:15-204:20.) Belcher accompanied Wandrick to HR to report Rouse's behavior to Nicholas Carmichael, the Senior HR Manager. (*Id*. 205:14-19.) Belcher reported her own concerns at this time regarding an incident that had happened in March 2008. (*Id.* 117:2-11, 125:13-126:6, 209:11-17.) Belcher reported that when she went to see Rouse for the treatment of blisters, Rouse rubbed and made comments about her legs, straddled her leg while dressing her blisters, which she characterized as "like he was humping my leg." (*Id.* 115:17-117:11.) After receiving these complaints about Rouse's behavior, FEI investigated Rouse and took the following actions: (1) issued Rouse a written reprimand; (2) permitted Rouse to treat female employees only when another female was present, (3) required Rouse to attend sexual harassment training. (Doc. No. 40-13, [11/10/08 Written Reprimand of Robert Rouse].) There is no record of any new or additional complaints received by FEI regarding Rouse for the duration of the Oak Grove Project. (Belcher Dep. 130:23-131:6, Doc. No. 40-2, ¶ 10 [Carmichael Decl.])

## 2. Support for Belcher's Authority

In December 2008, Belcher also called the Compliance Hotline and stated that Solis, her General Foreman and direct supervisor, was creating a hostile and manipulative environment by not supporting Belcher when she supervised her cleaning crew. Belcher claimed Solis undermined her authority when, for example, Belcher's crew complained to Solis that they were working too hard and Solis apparently sided with Belcher's cleaning crew instead of Belcher. (Belcher Dep. 104:18-105:20.) Upon receiving the complaint, FEI appointed Carroll Scott to conduct an on-site investigation into Belcher's concerns.  (Belcher Dep. 251:1-25; Doc. No. 40-8, at 3 [Compliance Hotline Report].) Scott met with Belcher, Solis and Jeff Schmidt, the newly-appointed Utility Superintendent, about Belcher's concerns.  (Belcher Dep. 131:7-16, 244:4-11; Doc. No. 40-8, at 3.) According to the resolution summary, Belcher reported that she was "pleased with the outcome of the meeting."  (Doc. No. 40-8, at 4.)  At the time of the investigation, Belcher did not communicate any dissatisfaction with the process.  (Belcher Dep. 251:1-252:9, 253:17-254:4.)

3. Inappropriate Comments by Coworkers

Belcher also alleges that her coworkers made inappropriate comments. Belcher alleges that (a) on her first day of employment, a female foreman told Belcher that Belcher was "not going to make it" and that all the "white hats" had a bet that Belcher would not be successful as a Utility Worker because she was "too fragile," (Doc. No. 5, ¶ 15 [Plaintiff's First Amended Original Complaint ("Cmp.")]); (b) a month after she began her employment, there were bets going around as to which employee or supervisor would get a date with Belcher first and which one would sleep with her first, (Doc. No. 5, ¶ 17; Belcher Dep. 85:17-86:20); (c) prior to her promotion, Solis asked her on a date and

made comments such as "I can hear you from here," (Belcher Dep. 110:8-17); (d) on the day of her promotion two male subordinates told Belcher that they did not work for her, one of whom told Belcher that he did not take orders from his wife and was not going to take orders from her and then "got in her face and yelled at her, which made [Belcher] feel threatened,"[2] (Doc. No. 5, ¶ 23; Belcher Dep. 274:2-15); (e) after her promotion, unnamed employees questioned whether Belcher had slept with Cheatham (the Utility Superintendent at that time) for her promotion, (Doc. No. 5, ¶ 17; Belcher Dep. 85:17-86:20); and (f) after Solis became Belcher's General Foreman, he told her to "get her girls in check, that HR was tired of the sexual harassment complaints and [that] she needed to get her girls under control."  (Doc. No. 5, ¶ 27.) Belcher did not report these claims to HR directlyor by using the Compliance Hotline. (Belcher Dep. 87:16-25, 110:8-17, 253:12-16, 274:16-275:4.)

4. Demeaning Tasks

Belcher was in charge of a crew that was composed of both men and women, and was regularly assigned to cleaning tasks.[3] Belcher found the cleaning work demeaning. For example, Belcher alleges that when men ran out of toilet paper in the portable restrooms, they used whatever they could find, and that Belcher's labor crew had to pick up the trash. (Belcher Dep. 267:9-22; 267:9-268:1.) When she brought these concerns to Cheatham, he explained to her that cleaning was a part of her crew's responsibilities. Belcher and her crew were provided with safety gear, including boots, gloves, and safety

---

[2] Belcher admits that she complained about her male subordinates' comments' to Cheatham and that Cheatham promptly removed these men from her crew the same day she raised her concerns.  (Doc. No. 5, ¶ 24.)

[3] Once promoted to Utility Foreman, her timecard and Amended Complaint establish that she supervised three men when she started her position as Foreman, a number that later reduced to two during her term at the Oak Grove Facility. (Doc. No. 5, ¶ 21; Doc. No. 40-12 [Timecard].)

glasses. The protective gear was in men's sizes and was uncomfortable for Belcher. (Belcher Dep. 315:2-316:20.)

5. Offensive Graffiti

Belcher also claims that her work environment was unacceptable because of offensive graffiti on the sidewalks and walls. Belcher alleges that there was sexually explicit graffiti, pictures of naked women, male private anatomy, and individuals involved in sexual acts drawn on the walls of the portable restroom. (Doc. No. 5, ¶14 [Cmp.]). In the women's restroom, rather than sexually explicit pictures, there were comments to the effect that Belcher "F'd" her way to the top. (Belcher Dep. 260:16-19)

6. Falling Objects on Belcher's Crew

Additionally, Belcher alleges that construction crews that worked in elevated areas above her crew would sometimes spit or urinate near Belcher and her crew.  (Doc. No. 5, ¶14; Belcher Dep. 262:11-15.) At the time of the incident, Belcher believed the liquid falling from above was water, and did not report her concerns to HR or the Compliance Hotline. (Belcher Dep. 265:21-266:4.) Sometimes the construction crew would drop tools or blocks of wood near Belcher's crew. (*Id*. 300:20-301:9.)   When Belcher notified Safety after a block of wood had fallen, Safety responded and investigated the area. (*Id*. 306:14:21, 308:19-309:9.) Belcher did not know who was dropping items, nor whether it was accidental or intentional. (*Id*. 306:22-307:5, 308:11-18.)  Welding crews worked in elevated areas above her crew, and according to Belcher, would sometimes shower sparks on or near her crew. (*Id*. 299:10-16.) When Belcher notified the Safety Department, it promptly instructed the welders to use a fire blanket to prevent the sparks from falling down. (*Id*. 300:12-14, 306:14-20, 311:12-20.) The

welders did what they could to stop sparks, but some showering nevertheless occurred. (*Id.* 313:12-20.) However, Belcher and her crew would move to a different location to avoid the showering of sparks when necessary. (*Id.* 313:17-314:3.)

## II. LEGAL STANDARD

Summary judgment is warranted where a party establishes that there is no genuine dispute about any material fact and the law entitles the party to judgment. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of demonstrating that there is no actual dispute as to any material fact of the case. Fed. R. Civ. P. 56(a), *Willis v. Roche Biomed. Lab.,* 61 F.3d 313, 315 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

Furthermore, the summary judgment standard "provides that the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis*, 61 F.3d at 315. First, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law are material." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Second, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). While all justifiable inferences should be drawn in the nonmovant's favor, conclusory affidavits will not suffice to create or negate a genuine issue of fact. *Anderson,* 477 U.S. at 255; *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shaffer v. Williams,* 794 F.2d 1030, 1033 (5th Circ. 1986).

## III. ANALYSIS

Before addressing the merits of Defendant's Summary Judgment Motion, the Court will address Plaintiff's Request for Leave to file a Surreply. The Court denies Plaintiff's request. The Federal Rules of Civil Procedure do not expressly provide for the filing of a surreply, thus necessitating parties to file a motion for leave before filing a surreply. *McClyde v. Jackson*, 2010 U.S. Dist. LEXIS 11082, *26 (S.D. Tex. 2010); Garrison v. Northeast Georgia Medical Center, Inc., 66 F.Supp.2d 1336 (N.D. Ga. 1999).

Leave to file a surreply is granted only in limited circumstances. *Lacher v. West*, 147 F.Supp.2d 538, 539 (N.D. Tex. 2001); *Ponder Research Group, LLP v. Aquatic Navigation, Inc.*, 4:09-CV-322-Y, 2009 WL 2868456 (N.D. Tex. Sept. 4, 2009); *Weems v. Hodnett*, 10-CV-1452, 2011 WL 2731263 (W.D. La. July 13, 2011). The Court finds that the Defendant did not raise new legal theories or attempt to present new evidence in the Reply that would necessitate a surreply by Plaintiff. Thus, the Court denies Plaintiff's request to file a surreply.

**1. Belcher's Sex Discrimination Claim**

Belcher's claims are governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Belcher must first establish a prima facie case by establishing: (1) she was in a protected class (female); (2) she was otherwise qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than other similarly situated employees under nearly identical circumstances. *Lee v. Kansas City of Souther Ry. Co.,* 574 F.3d 253, 259 (5th Cir. 2009). If Belcher can establish a prima facie case, the burden of production shifts to FEI to articulate a legitimate, nondiscriminatory reason for its employment decision(s). *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

9

If FEI has articulated legitimate, nondiscriminatory reason for all of the adverse employment actions it has taken with respect to Belcher, Belcher may prevail only by proving that each of FEI's proffered reasons is pretextual or that FEI was somehow motivated by Belcher's sex in making its decision. *Nasti v. Ciba Specialty Chem. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). Pretext is not established if Belcher creates only a weak issue of fact as to whether FEI's reason is untrue, and there is "abundant and uncontroverted independent evidence that no discrimination . . . occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

The Court finds that Belcher has not established a prima facie case. Both parties agree that she was in a protected class, and was otherwise qualified for her position as a supervisor of a Utility crew. The parties disagree on which of FEI's acts should qualify as an adverse employment action (see discussion below); however, both parties agree that Belcher's layoff was an adverse employment action. For intentional discrimination claims, an actionable adverse employment action must be an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting, and compensating." *McCoy*, 492 F.3d at 559. Belcher was laid off earlier than the other supervisors of Utility crews, and her layoff qualifies as an adverse employment action. Thus, the first three factors of establishing a prima facie case have been established.

However, the Court finds that Belcher was not similarly situated to the other Utility Supervisors. The Fifth Circuit defines "similarly situated" narrowly. *Silva v. Chertoff*, 512 F.Supp.2d 792 (W.D.Tex.2007). Similarly situated individuals must be "nearly identical" and must fall outside the plaintiff's protective class. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir.2005). See also *Perez v. Texas Dep't of Criminal*

*Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir.2004) ("We ... have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.' "); *Hockman v. Westward Communications, LLC*, 282 F.Supp.2d 512, 527-28 (E.D.Tex.2003) ("[E]mployees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.' "), citing *Okoye v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir.2001) (Employees are not in nearly identical circumstances when their actions were reviewed by different supervisors; "to establish disparate treatment a plaintiff must show that the employer 'gave preferential treatment to [another] employee under 'nearly identical' circumstances' "...; that is "the misconduct for which [plaintiff] was discharged was nearly identical to that engaged in by ... [other] employee[s].' ")).

FEI selected Belcher instead of the other Utility Foremen because: (a) she was the only Utility Foreman with any disciplinary history—she had received two reprimands; (b) she had the least amount of construction industry experience; and (c) she had the least supervisory experience. (Doc. No. 40-9, ¶ 13 [Carmichael Decl.].) Belcher argues that these reprimands themselves were a product of discrimination, and that reprimands should be considered as an adverse employment action. Belcher cites *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999), arguing that reprimands are an actionable adverse action. However, *Sharp* considered First Amendment retaliation under § 1983 and is inapposite. Belcher's reprimands are not considered an actionable adverse employment action under established Fifth Circuit law. *McCoy*, 492 F.3d at 559. Belcher also argues other conduct should be considered an 'adverse employment action':

a) **The Assignment of "Demeaning" Job Duties:** Belcher's claim that her crew was given "demeaning" cleaning jobs does not constitute an ultimate employment action. *See Hart v. Life Care Ctr. Of Plano*, 243 Fed. Appx 816, 818 (5th Cir. June 26, 2007) (being assigned more difficult tasks is not actionable).[4] Moreover, Belcher admits that (1) cleaning was an essential part of Utility Workers' job duties, and (2) that as the supervisor, Belcher could opt out, and (3) that the cleaning crew included men and women performing the cleaning tasks. (Belcher Dep. 165:18-166:2, 271:2-272:8, 218:3-12; Doc. No. 40-14 [Utility Worker Job Description])

b) **The Denial of Training Opportunities**: Belcher alleges that when she took training classes, Solis was waiting for her outside the classroom and wanted to know when the classes were going to end. (Belcher Dep. 220:18-223:9.) "[T]he Fifth Circuit has consistently refused to find that a denial of training can constitute an adverse employment action." *Jones v. BP Amoco Chemical Co.*, 2012 WL 1424986, at *6 (S.D. Tex. April 23, 2012).[5] Furthermore, Belcher herself does not allege any specific training that she was denied, and in fact took advantage of training opportunities.

c) **Lack of supervisory "support"**:  Belcher's claim that she lacked the support of her supervisor(s) is not an adverse employment action because she has not demonstrated that the alleged lack of support affected her layoff. Solis, the only

---

[4] *See also Leach v. Baylor College of Medicine*, 2009 WL 385450 (S.D. Tex. Feb. 17, 2009) (imposing a higher workload on an employee than his coworkers is not an ultimate employment action); *Stanley v. Univ. of Tex. Med. Branch, Galveston*, 425 F.Supp.2d 816, 824 (S.D. Tex. 2003) (assigning additional physical labor not actionable).

[5] See also, *Robertson v. Game Stop/Babbage's*, 152 Fed. Appx. 356, 361 (5th Cir. 2005) (denial of training not adverse employment action); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (failure to provide computer training not adverse employment action); *Martin v. Lennox Int'l, Inc.*, 342 Fed. Appx. 15, 18 (5th Cir. 2009) (denial of training that does not result in a change of the plaintiff's employment status, benefits, or responsibilities does not constitute an adverse employment action).

individual Belcher alleges did not support her, was not involved in the layoff decision.[6] Although Belcher claims her managers were not "supportive," "[n]ot everything that makes an employee unhappy is an actionable adverse employment action." *Martin v. Kroger, Co.*, 65 F. Supp. 2d 516, 535 (S.D. Tex. 1999).

Thus, the Court considers only Plaintiff's layoff to be an adverse employment decision. With regard to Plaintiff's layoff, the Court finds that Plaintiff has not made a prima facie case of sex discrimination, because the other supervisors were not similarly situated to Plaintiff. However, even if Plaintiff had made a prima facie case, Defendant has provided legitimate, nondiscriminatory reasons for laying off Plaintiff, and Plaintiff has not demonstrated that these reasons are actually pretext for discrimination. The Oak Grove Project was a temporary one, as Belcher was made aware when she signed onto the job. (Belcher Dep. 236:7-13.) The Project was approaching substantial completion when Belcher was laid off. (Doc. No. 40-9, ¶ 12 [Carmichael Decl.].) A reduction in workforce is a legitimate, nondiscriminatory reason for Belcher's termination. *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 356-67 (5th Cir. 2007) (reorganization of department, which eliminated plaintiff's position, was legitimate, nondiscriminatory reason for discharge); *EEOC v. Texas Instruments, Inc*., 100 F.3d 1173, 1181 (5th Cir. 1996) (RIF is a legitimate, nondiscriminatory reason for a discharge).

Defendant provides three reasons for Belcher's layoff: a) she was the only Utility Supervisor with any disciplinary history, b) she had the least construction industry

---

[6] George Dove, Construction Manager, evaluated the Utility Foremen and, based on these objective criteria, ranked Belcher first on the ROF ("Reduction of Force") Worksheet.  (Doc. No. 40-9, ¶ 12 [Carmichael Decl.]; Doc. No. 40-11 [ROF worksheet].)  Belcher's selection and placement on the ROF Worksheet was independently reviewed and approved by Schmidt (Utility Superintendent) and Carmichael (Senior HR Manager).  *Id.*

experience, and c) she had the least supervisory experience. Plaintiff does not contest that she had less construction or supervisory experience. Instead, Plaintiff argues that the absence policy, under which Belcher received one reprimand, was selectively enforced when management wanted to get rid of someone (Doc. No. 45-5, ¶ 38 [Belcher Decl.].) Belcher claims that she was mistakenly written up eight months after her absences, and that her supervisors agreed to throw the write-up away, but never did. (Belcher Dep. 132:23-135:23.) Belcher also claims that Batten, another supervisor, had a disciplinary history similar to hers. When Belcher was not yet a supervisor, she was given an oral reprimand for engaging in an argument with a fellow nonsupervisory worker. Batten, on the other hand was a supervisor with more construction and supervisory experience than Belcher. His disciplinary history consisted of being "chewed out" for engaging in a 'heated discussion' with a fellow supervisor. Even if Batten should have been issued an oral reprimand for his argument with a fellow supervisor, his position, construction, and supervisory experience do not make him an apt comparison to Belcher.

Plaintiff's arguments are not sufficient to raise a fact issue as to whether FEI's decision to terminate Belcher was pretext for discrimination. Putting aside the contested reprimands that Belcher received, FEI has provided two legitimate, nondiscriminatory reasons based on Belcher's experience level. Plaintiff does not argue that these independent reasons to terminate her are evidence of pretext. The Fifth Circuit has found that, as long as the justifications for termination are not inconsistent or conflicting, one separate, independent justification can suffice to provide a legitimate, nondiscriminatory reason. *Nasti v. CIBA Specialty Chemicals Corp*., 492 F.3d 589, 593 (5th Cir. 2007). In providing a legitimate, nondiscriminatory reason for its actions, the employer is not

required to convince the Court that it was actually motivated by this reason; it need only raise a genuine issue of fact as to whether or not it discriminated against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Once the defendant has raised a legitimate, nondiscriminatory reason for its actions, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To satisfy this burden, a plaintiff must produce substantial evidence that the employer's proffered reasons for its actions were a pretext for discrimination. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir.2001). A plaintiff can establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap, Inc*., 333 F.3d 572, 578 (5th Cir.2003). (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). Belcher falls short of her burden of presenting evidence rebutting each of the legitimate, nondiscriminatory reasons produced by FEI, since she does not contest that the other supervisors had more experience than she, and that she was aware the Oak Grove Project was a temporary project.

## 2. Belcher's Hostile Environment Claim

To establish a sexually hostile work environment, Belcher must prove she: (1) belongs to a protected group (female); (2) was subject to unwelcome harassment; (3) the harassment complained of was based on her sex; (4) the harassment complained of

affected a term, condition, or privilege of employment; and (5) FEI knew or should have known of the harassment in question but failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). In determining whether a work environment is objectively hostile or abusive, and thus actionable under Title VII, courts look to the totality of the circumstances and examine:  (1) the frequency of the conduct in question; (2) its severity; (3) whether it was physically threatening or humiliating as opposed to a mere offensive utterance; and (4) whether the complained-of-conduct unreasonably interfered with Belcher's work performance.  *Harris v. Forklift Sys.*, 510 U.S. 17, 22-23 (1993).

Many of Belcher's allegations are based upon conduct witnessed or experienced by other women.[7] The parties disagree over whether discrimination faced by other women is relevant summary judgment evidence for Belcher's claim. The Court finds that such evidence is relevant only if it affected a term, condition or privilege of Belcher's own employment. *Green v. Administrators of the Tulane Educational Fund*, 284 F.3d 642, 655 (5th Cir.2002); *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298-99 (5th Cir.2001). The Fifth Circuit requires that a plaintiff must specifically identify the alleged harassment that she herself experienced, rather than broad generalizations of

---

[7] For example, Belcher's response references a sexual harassment incident experienced by Esmeralda Smith, and Belcher claims no one investigated the incident. (Doc. No. 45, at 5 [Plaintiff's Response]) (Smith Dep. 29:18-31:4 (Dec.20, 2011); (Doc. No. 45-4, ¶7 [Smith Decl.]). Although Smith told Belcher of the incident, there is no evidence that Belcher knew that no one failed to investigate the alleged incident. Plaintiff also cites a statement made by Rhonda Woolard that "guys were not having to do the same work as the women were doing", but without evidence that Belcher knew about this complaint. (Doc. No. 45, at 12 [Plaintiff's Response]); (Woolard Dep. 77:4-80:18 (Dec. 19, 2011)). Belcher's Response also argues that women were not made of training opportunities and often had to stay too late to take advantage of these opportunities; however, these statements actually comes from Smith's deposition. (Smith Dep. 98:9-99:14); (Doc. No. 45-4, ¶11 [Smith Decl.]).Belcher herself took advantage of training opportunities, and again, Plaintiff presents no evidence that she could not take advantage of these opportunities. These instances are not meant to serve as an exhaustive list of other women's complaints Plaintiff identifies in her Response, but rather as examples.

harassment in the workplace experienced by others. *Celestine v. Petroleos*, 108 Fed. Appx 180, 188 (5th Cir. 2004); *Septimus v. University of Houston*, 399 F.3d 601, 612 (5th Cir. 2009) (evidence about harassment of others not relevant to avoid summary judgment because plaintiff did not personally experience such conduct). Thus, the Court considers evidence of other women's harassment in so far as it affects Belcher's own hostile environment claim under Fifth Circuit law.

Title VII is not "a general civility code" and thus the vast majority of conduct in the workplace, even if boorish and offensive, does not present a hostile work environment under Title VII unless it is because of sex, and is subjectively and objectively abusive. *White v. Government Employees Ins. Co.*, 457 Fed. Appx. 374, 377 (5th Cir. 2012). The conduct described by Belcher, including the offensive graffiti, inappropriate comments, and relegation of most of the women to the "women's crew" is no doubt deplorable. However, "[t]he hostile work environment standard is a 'demanding' one, and requires proof of severe or pervasive conduct that can be categorized as 'extreme.'" *Duplechin v. Potter*, 2012 WL 845160 at *5 (S.D. Tex. Mar. 12, 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The conduct described by Belcher does not meet the hostile environment standard. For example, the inappropriate comments made by Belcher's coworkers, referenced in Section 3 of the facts, do not satisfy the Fifth Circuit's standard. *Hockman v. Westward Commc'ns*, 407 F.3d 317, 236 (5th Cir. 2004) ("alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents" and to survive summary judgment a plaintiff must show that the harassment was so severe or pervasive that it "destroyed [her] opportunity to succeed in the workplace). Furthermore, Plaintiff

argues that the assignment of demeaning duties—such as sweeping, cleaning, and picking up trash—created a hostile environment. However, Belcher was aware she could opt out of the duties, and that the duties were part of her job. (Belcher Dep. 165:18-166:2, 218:3-5; 270:25-272:8; Doc. No. 40-14 [Craft Position Summary].) Defendant argues that when conduct is equally harsh towards men and women, there can be no hostile work environment claim based on sex. See *Reine v. Honeywell Int'l, Inc.*, 362 Fed. Appx 395, 397 (5th Cir. 2010) (per curiam); *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 270-71 (5th Cir.1998). Plaintiff responds that, despite the two or three men on Belcher's crew, it was widely known as the women's crew, and most women were sent to work on Belcher's crew. The Court finds that, even if Belcher's crew was viewed as the "women's crew," because of the greater proportion of women to men, the cleaning tasks themselves given to the women's crew are not so demeaning as to create a hostile environment.

Belcher also claims that construction crews working in elevated areas above her cleaning crew would occasionally (a) spit or urinate near Belcher and her crew, (Doc. No. 5, ¶14 [Cmp.]; Belcher Dep. 262:11-15); (b) "shower" sparks on her or near her crew, (Belcher 299:10-16); and (c) drop tools and blocks of wood near her crew, (Belcher Dep. 300:23-301:9.) However, Belcher does not present evidence that the acts occurred because of Belcher's sex since both men and women worked on her crew. See *Reine*, 362 F. App'x at 397; *Butler*, 161 F.3d at 270-71 (5th Cir. 1998). Because Belcher cannot testify that such incidents were intentional, she also cannot establish the conduct was because of her sex.

Belcher argues that she does not have to prove that the factors creating a hostile environment were severe, but merely that they were pervasive *or* severe. See *Harvill v.*

*Westward Communications, L.L.C.*, 433 F.3d 428, 435-36 (5th Cir. 2005); *El-Hakem v. BJY Inc*., 415 F.3d 1068, 1073 (9th Cir. 2005) ("'The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.'") (quoting *Nichols v. Azteca Rest. Enters., Inc*., 256 F.3d 864, 872 (9th Cir. 2001)). However, Belcher could not testify as to the frequency of such incidents, an important factor in judging the pervasiveness of the conduct was. (Belcher Dep. 263:3-19.)  *See e.g., Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996). Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable. *Id*. Additionally, the conduct that was reported to FEI was addressed and investigated, meaning that Belcher has not shown that FEI knew or should have known of the harassment in question but failed to take prompt remedial action, a requirement of a hostile environment claim. *Hernandez*, 670 F.3d at 651 (5th Cir. 2012).

Finally, Belcher testified that the offensive graffiti she saw is a factor which contributes to her hostile environment claim. Although Belcher's Complaint lists various types of graffiti, her Complaint relies on the observations of other women. Belcher testified that the graffiti she actually observed was of a silhouette of a nude female and that she observed graffiti only "periodically" while she was working at Oak Grove. (Belcher Dep. 255:6-256:14.) Belcher cannot establish that the depictions specifically targeted her or female employees generally, since the graffiti was in common areas of FEI.  (Doc. No. 5, ¶14 [Cmp.]; Belcher Dep. 260:6-19.) *See Campbell v. Meredith Corp.*, 260 F. Supp.2d 1087 (D. Kan. 2003) (alleged sexually offensive graffiti to which male employee was exposed in workplace did not create sexually hostile environment; graffiti constituted simple teasing or gender-related jokes equally offensive to men and women,

was not physically threatening and was not directed at the employee).[8] Belcher testified that the restrooms designated for use by female employees did not contain sexually explicit pictures. (Belcher Dep. 260:6-19.) Belcher did testify that there were comments to the effect that Belcher "F'd" her way to the top. (Belcher Dep. 260:16-19.)  Although such graffiti is wholly inappropriate, the existence of pornography or sexually explicit materials in the workplace, even coupled with sexually suggestive comments, is insufficient to create an actionable hostile working environment claim under Title VII. *Young v. Houston Lighting and Power*, 11 F. Supp.2d 921, 932-33 (S.D. Tex. 1998) (atmosphere that included sexual jokes, references that women were promoted due to sexual relationships, employees talking about their sex lives, jokes degrading women, sexually explicit posters at watch stations, and other anti-female behavior did not rise to the level required to establish a hostile work environment).

Furthermore, Belcher must establish that FEI knew or should have known of the harassment and failed to take remedial action. When Belcher complained about aspects of the hostile environment, they were addressed without further complaint from Belcher. For example, in response to the graffiti, all restrooms were regularly cleaned on a daily basis to remove graffiti and pictures. (Belcher Dep. 261:11-21, 268:4-10; Carmichael Dep. 28:8-13). When a concern arose that men may have been entering restrooms

---

[8] The Court recognizes that, if sexual graffiti was combined with other actions, and prompt remedial action was not taken, a hostile environment claim would be plausible. *See, e.g., Waltman v. Int'l Paper Co*., 875 F.2d 468 (5th Cir. 1989) (female employee raised factual issue by introducing evidence that several different employees touched her in a sexual manner and directed sexual comments to her, that there was ongoing sexual graffiti on the walls, that some of the graffiti was directed at her, and that she reported harassment to higher management on three occasions without remedial action).

designated for use by female employees, the restrooms were secured by a lock-and-key to prevent male employees from graffiti or pictures in them. *Id.* When sparks fell on her crew from the elevated area, and Belcher reported her concern, the welders were instructed to use fire blankets to minimize the falling of sparks. (Belcher Dep. 300:12-14, 306:14-20, 311:12-20.) With respect to Belcher's complaints about "Doc" Rouse, FEI conducted an investigation and took action. Although Belcher argues that there the investigation results were not reported to her, Belcher admitted that she was not aware of any new complaints or concerns regarding Rouse after FEI took action. (Belcher Dep. 130:23-131:6.) FEI similarly took action with regard to Belcher's Hotline complaints concerning Solis, and Belcher never reported she was displeased with FEI's actions. (Doc. No. 40-8 [Case History]; Belcher Dep. 244:4-11, 251:1-252:12, 253:17-254:4.) These admissions establish, as a matter of law, that FEI's actions were prompt and reasonably calculated to end the harassment. *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 329-30 (5th Cir. 2009) (because plaintiff conceded that the complained-of-harassment ended after the employer took action, the employer's actions were, as a matter of law, reasonably calculated to end the harassment).

However, in other instances, Belcher failed to take advantage of FEI's remedial measures to address her claims, for example, with regard to the inappropriate comments, or the water falling that she now believes was urine. Belcher's failure to report harassment bars her claim. *Lauderdale v. Tex. Dept. of Criminal Justice*, 512 F.3d 157 (5th Cir. 2007) (if there are multiple avenues to notify the employer of alleged harassment, an employee failure to utilize such options is unreasonable and bars her claim). In Belcher's Response, she argues that she tried to bring up the harassment

complaints of other women on her labor crew to her Superintendent, Cheatham, but was ignored. (Doc. No. 45, at 5 [Response]). However, there are no facts to establish that the harassment of other women affected a term, condition, or privilege of Belcher's *own* employment.  Furthermore, the Fifth Circuit has noted that "informal complaints to a co-worker are insufficient" to put an employer on notice of the need to address the misconduct. *Williams v. Barnhill's Buffet, Inc*., 290 F. Appx 759, 763 (5th Cir. 2008) (informal complaints to a co-worker may not afford the employer a reasonable opportunity to address her concerns). If Belcher was dissatisfied with Cheatham's response, she should have brought her complaint to HR or the Hotline, Under Fifth Circuit law, she unreasonably failed to take advantage of corrective opportunities provided by FEI. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 329 (5th Cir. 2004).

Even taking the conduct described by Belcher in its totality—the inappropriate comments, the graffiti, the items dropped upon her crew from above, and the demeaning tasks assigned to her crew, the conduct does not rise to the level that the Fifth Circuit has found necessary for a hostile environment claim.[9] Belcher has failed to make out the prima facie case necessary for establishing a hostile work environment. She also has not

---

[9] See, e.g., *Barnett v. Boeing Co.*, 306 Fed. Appx. 875, 897 (5th Cir. 2009) (affirming summary judgment in hostile environment claim despite evidence that male coworker leered at her, touched her in sexually inappropriate and unwelcome ways, and actively intimidated her after she complained about his actions); *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (male coworker's actions of making one remark to the plaintiff about another employee's body, slapping the plaintiff on her behind with a newspaper, grabbing or brushing against the plaintiff's breast and behind, attempting to kiss the plaintiff on one occasion, and standing in the door of the women's bathroom while the plaintiff was washing her hands were isolated, non-serious events that did not qualify as hostile environment); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871 (5th Cir. 1999) (male coworker's conduct was not severe or pervasive where he once remarked that plaintiff's elbows were the same color as her nipples, once told her she had big thighs while pretending to look up her dress, stood over her desk on several occasions and attempted to look down her clothing, touched her arm and rubbed her shoulder on several occasions, and on two occasions patted his lap and said "here's your seat" after she arrived late for office meetings).

raised a fact issue demonstrating: (1) that the harassment affected a term of her employment, or (2) that FEI failed to take remedial action once they knew about harassment, both of which are conditions necessary to bring a hostile work environment claim.

### 3. Belcher's Retaliation Claim

Plaintiff argues that she has established a prima facie case of retaliation by showing that (1) she engaged in several protected activities; (2) adverse employment actions occurred; and (3) there were a causal links between the protected activity and the adverse employment action. *See Taylor v. United Parcel Serv. Inc.,* 554 F. 3d 510, 523 (5th Cir. 2008). With the exception of Belcher's layoff, none of FEI's actions would constitute an adverse employment action. (See Section III(1)).

Belcher's retaliation claim fails because she cannot show causal links between her protected activities and her layoff. There is no evidence that Dove, the manager who selected Belcher as the first Utility supervisor layoff, had any knowledge of Belcher's protected activities or harassment claims. Belcher must produce "at least some evidence that the decision makers had knowledge of [her] protected activity." *Manning v. Chevron Chem. Com.*, 332 F.3d 874, 883(5th Cir. 2003). "If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." *Id.* Plaintiff has produced no facts suggesting that Dove had knowledge of her protected activities.

Even if Belcher had made a prima facie case, Defendant has provided a legitimate, nondiscriminatory reason for its actions. Belcher was aware that every craft

worker at the Oak Grove Project would be eventually laid off, since the Project was approaching completion. There is no fact dispute that Belcher had the least amount of construction and supervisory experience, and thus was the first Utility Supervisor to be laid off. (Doc. No. 40-9, ¶ 13 [Carmichael Dec.]). Belcher has not provided any evidence of pretext regarding her employer's provided reasons.

## IV. CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment (Doc. No. 40) is **GRANTED.** The case is **DISMISSED WITH PREJUDICE**.[10]

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 8th day of February, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[10] The Court does wish to note that it is extremely uncomfortable that the state of the applicable law compels dismissal. The allegations of misconduct are serious and, in some instances, odious. However, this Court's sworn duty is to apply existing law, not to offer its own version of what the law should be.

24